Affirmed and Opinion filed July 25, 2002
















Affirmed and
Opinion filed July 25, 2002.

 

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NOS. 14-00-00305-CR and 

  14-00-00306-CR

____________

 

BURRELL MURCHISON AND RICHARD MURCHISON, Appellants

 

V.

 

THE STATE OF TEXAS, Appellee

 

______________________________________________________

 

On Appeal from
the 178th District Court

Harris County, Texas

Trial Court
Cause Nos. 806,011 and 806,012

 

______________________________________________________

 

O P I N I O
N

            In this consolidated appeal,
appellants Burrell Murchison and Richard Murchison challenge their convictions
for securities fraud.  They assert the
trial court erred by excluding expert testimony, refusing their mistake-of-fact
instruction, charging the jury in a way that violated their constitutional
right to a unanimous verdict, and making numerous comments on the weight of the
evidence.  Appellants also assert the
evidence was not legally or factually sufficient to support the jury’s finding
that they had an intent to defraud and that 








the
evidence was factually insufficient to prove that Richard Murchison was liable
under the law of parties.  We affirm both
of the trial court’s judgments.

                              I.  Factual and Procedural Background

            In 1985, appellants, along
with Joel Hurst, formed a Texas limited
partnership in which a Texas
corporation served as the general partner. 
Eventually, the partnership dissolved; however, the business operations
continued as the newly formed Hurst-Murchison Corporation.  Later, Joel Hurst left the business.  Appellants reorganized the company in
September of 1993, and created a holding company called Murchison Group, Inc.
(“Murchison Group”).  Wholly owned by
appellants, Murchison Group, in turn, established a subsidiary called Murchison
Investment Bankers (“Investment Bankers”). 
Investment Bankers was a securities broker/dealer and had two major sections
— institutional sales and retail sales. 
Murchison Group also established a subsidiary named Murchison Financial
Group (“Financial Group”).  Financial
Group was primarily composed of licensed insurance sales representatives and
was largely concerned with developing business with individual investors. 

            The Murchison companies were
successful and grew rapidly.  By 1993,
Investment Bankers was one of the top twenty broker/dealer firms in Texas, measured
by volume of business.  Investment
Bankers earned ninety-five percent of the revenue of these companies, and it
was the “engine that drove the companies.” 
Appellants were the principal owners of the Murchison companies.  Richard Murchison (“Richard”) generally
handled matters related to sales and personnel, and Burrell Murchison
(“Burrell”) generally handled financial issues. 
           In 1992, Hurst-Murchison
sold debentures to a number of investors. 
Dale Hearn worked as a certified financial planner for the Murchison
companies for a number of years and later managed the retail side of Investment
Bankers.  According to Hearn, Burrell
stated that the company was selling the 1992 debentures to build reserves, and
the money raised was not supposed to be used to purchase equipment or other
types of capital.  Rather, according to
Burrell, the sales proceeds were to be “left in the bank” to increase the
company’s reserves and allow it to do other kinds of business.  The debentures were to pay ten-percent
interest.  The proceeds from the sale of
the debentures were to be used to purchase securities issued by the United
States Treasury (“Treasuries”).  These
Treasuries would pay six percent, making the net cost to the company of
borrowing the money only four percent. 
This information was given to the sales representatives who were selling
the debentures.  Hearn testified that it
was well known at the company that the 1992 debentures were backed by
Treasuries.  

            Keith Mitcham
worked as a certified financial planner. 
He joined the company in 1990, and eventually became head of the
financial group.  In 1992, Mitcham attended a sales meeting concerning the
debentures.  Burrell and Richard were
both present.  At the meeting, Burrell
again explained that the debentures would pay ten-percent interest and would be
backed by Treasuries.  Sales
representatives were given this information to pass on to potential purchasers
of the debentures.  Mitcham
sold a $50,000 debenture to his father-in-law, Dale Collins.  Collins indicated he invested in a 1992
debenture, in part, because Mitcham told him the
money would be held in some form of government securities.

            The company received $450,000 from
the sale of the 1992 debentures; however, the company purchased only $300,000
of Treasuries.  Further, the company did
not hold the Treasuries for the whole term of the debentures; rather, it sold
the Treasuries in July of 1993. 
Nonetheless, the company made the required interest payments to the
holders of the 1992 debentures until July 1994. 

            The Murchison companies had a good
year in 1993.  At the end of 1993, the
total retained earnings of the companies was $996,000.  However, the growth the companies had enjoyed
did not continue into 1994.  Investment
Bankers had acquired several bonds that began to decline in value.  This decline, along with other factors,
caused Investment Bankers to begin experiencing operating losses in January
1994.  At that time, the company had a
loss of $116,000, of which $96,000 was caused by declining bond value.  In February 1994, Investment Bankers lost
$169,000.  In March 1994, Investment
Bankers lost $319,000, of which $189,000 was caused by declining bond
value.  In April of 1994, Investment
Bankers lost $155,000, of which $78,000 was caused by declining bond value.  By May 1994, the bonds in question were no
longer on the books of the company, for reasons described below.  Despite this fact, the company still lost
$75,000 in May of 1994.  In June of 1994,
Investment Bankers lost $259,000, and in July of 1994, the company lost
$79,000.  In sum, Investment Bankers had
substantial operating losses in every month in 1994 in which it conducted
business.  

            In April of 1994, Burrell and
Richard summoned James Arnold, a salesman at Investment Bankers, to a private
meeting.  They told Arnold that the
company owned some bonds and asked Arnold if he
would consider placing the bonds with some of his accounts.  Burrell and Richard told Arnold that it
would be up to him to decide which accounts were appropriate.  Arnold described
his understanding of their request, stating:

[U]pon doing the transaction, this would be
for a temporary period of time because the firm wanted to keep the bonds but
they wanted to get them off the books at the same time.  And so what I was asked to do was to place them
with my customers on a temporary basis, giving the customers the understanding
that within a six-month period of time Murchison Investment Bankers would
purchase the bonds back at the same price. 
So in effect the customer could collect the interest during that period
of time and not have the risk of what happens to the bonds six months from now
or if the market changes or anything like that.

 

            At their meeting with Arnold, the Murchisons discussed a bond known as a “Freddie Mac 1668S,”
an inverse floater, collateralized mortgage obligation.  Arnold sold this
bond to his customers at the price the company had paid for the bond, even
though this price was above the market price at the time.  Arnold said that
his customers agreed to that arrangement because they trusted him.  Arnold did not receive
anything in writing documenting his meeting with Burrell and Richard, nor did
he receive anything memorializing the repurchase arrangement that Burrell and
Richard indicated would govern the sale of this bond to Arnold’s
clients.  Arnold was able
to sell the 1668S bond about thirty minutes after his meeting with the Murchisons.  Arnold split the
bond in half and sold the halves to
 two of his clients. 
Although Arnold made the
repurchase agreement part of these sales, he did not document the repurchase
agreement by filling out a “ticket,” a document the company used internally to
keep track of assets and liabilities. 
For these trades, Arnold’s
customers trusted his representations about the repurchase agreement and did
not ask for confirmation of that agreement in writing at the time of the
sales.  

            About a month later, Arnold met with
Burrell regarding another bond, a principal-only  bond designated 9424-H.  This meeting was similar to the earlier
meeting.  Burrell told Arnold that the
9424-H bond was in the company’s inventory and that they needed to get it off
the books.  Burrell asked Arnold to make
the same arrangements for the sale of this bond as he had done for the 1668S
bond.  Burrell told Arnold that he was
being given the opportunity to participate in these transactions because he had
been a good salesman and because offering this investment opportunity would
allow Arnold to “do something” for his customers.  Arnold understood
he would not be paid a commission for the sales of these two bonds, and Arnold was
willing to waive his commission because he believed that, from his clients’
perspective, these sales were “great — almost like a gift.”  Arnold reasoned
that, after the company repurchased the bonds, these clients would use the
money to purchase other investments through the company, and Arnold would
receive commissions on these subsequent sales. 
Further, the Murchisons explained to Arnold that he
was doing a favor for the company as well as for his clients.  

            As to the sale of the 9424-H bond,
Burrell also told Arnold that the
company would guarantee the buyers of that bond a ten-percent return.  Burrell signed a letter that explained the
terms of the company’s guarantee of a ten-percent return to the buyers of this
bond.  Arnold sent a copy
of this letter to one potential customer; however, about a day and a half after
Arnold received
the letter, he returned it to Burrell at Burrell’s request.  Arnold eventually
split the bond in half and sold the halves to
 two other clients. 

            Although Arnold no longer
had the letter, the buyers of the 9424-H bond often called Arnold to ask for
written confirmation of the terms by which they were buying this bond.  Arnold approached
both Burrell and Richard on at least a monthly basis for the next three or four
months and tried to get this written confirmation.  Initially, the Murchisons
told Arnold the
confirmation would be forthcoming. 
However, as time passed, they told him that there would be no written
confirmation and that he should tell his customers to “hang in there.” At this
time, Arnold was aware
that sales were falling dramatically, and as he watched the sales decline, he
became increasingly concerned the company would not be able to repurchase the
bonds he had placed with his customers.  Arnold expressed
his concerns to Burrell and Richard, and they told him not to worry and that
everything was under control.  They
emphasized that, more than anything, it was important that Arnold make sure
his customers felt confident.

            Eventually, Arnold went to
Dale Hearn, Investment Bankers’ retail-compliance officer, to discuss his
concerns.  Hearn became more and more
upset as Arnold told him
the details of the bond transactions. 
Hearn believed that Arnold was
describing an illegal scenario known as “bond parking.”  Hearn immediately took Arnold to speak
with Richard and told Richard what Arnold had
related to him.  Richard said that he
understood why Hearn was concerned but that this was a “gray area.”  Richard also told Arnold that the
company would never do anything to hurt his clients and that he did not need to
worry about this situation.  Arnold was not
satisfied with Richard’s reassurances and sought advice about this situation
from various people he trusted. 
Eventually, Arnold consulted
an attorney and, on his counsel’s advice, contacted the National Association of
Securities Dealers (“NASD”), a private-sector provider of financial regulatory
services that regulates the securities industry.

            The NASD conducted an audit of
Investment Bankers in August of 1994, in order to investigate Arnold’s report
and conduct a full sales-practice review. 
The NASD found that Investment Bankers had not included its obligations
to repurchase the 1668S bond and the 9424-H bond in its reported liabilities.  After booking these transactions and
appropriately listing the liabilities, Investment Bankers was below the NASD’s net-capital requirements and was forced to cease its
business operations.  Regarding these two
bonds, the NASD determined that Investment Bankers should have booked
additional liabilities totaling roughly $1.5 million and additional assets
totaling $710,000.  After making these
adjustments, the company had a negative net-capital balance of approximately
$750,000.  According to an expert witness
called by the State, Investment Bankers’ records showed that the company had
gone into a negative net-capital situation at some point in April of 1994. 

            Even though the Murchison Group and
its affiliates were experiencing financial problems in 1994, Burrell and Richard
initiated the offering of a second group of debentures.  On March 17, 1994, Burrell and Richard
conducted a meeting at which they announced the following terms on which the
new debentures would be sold: (1) a total of $500,000 in debentures would be
sold in blocks of $25,000; (2) the debentures would pay ten-percent interest;
(3) the debentures would be “good enough” to be sold into customers’ IRA
accounts; (4)  after 24 months, the
interest would increase to eleven percent, and after 48 months, it would
increase to twelve percent; (5) the company would inventory approximately $2
million in bonds and $300,000 in cash as “collateral” for the new debentures;
and (6) the proceeds from the sale of these debentures would be used to
increase the net capital of the company. 
   

            Burrell and Richard presented the
group with a booklet that described the company and included its 1993 financial
statements.  The booklet was to be used
by the sales representatives to sell the debentures.  During this period in early 1994, Burrell and
Richard indicated that “everything was going great,” that they were buying new
properties, and that they recently had increased their capital and
expanded.  Charles Pugh, a retail
salesman at the company, testified that everyone in the retail division and
most of the people from the wholesale side of the company were present at this
meeting.  Pugh also stated that, whenever
the sales representatives made a pitch to a potential buyer of debentures, they
provided the potential customer with a copy of the 1993 financials.  Responding to subsequent requests from Pugh
for updated financials, the Murchisons told him he
had the most current financial reports available.  

            Burrell also indicated to sales
representatives and customers that the proceeds from the sales of the
debentures would be used to buy Treasuries. 
Various customers who bought debentures from the company in 1994
testified that they would not have purchased the debentures if they had known
any of the following: (1) that Investment Bankers had sustained operating
losses in the early months of 1994; (2) that the company had sold the
Treasuries that “backed” the 1992 debentures; (3) that the proceeds of the 1994
debentures would be used to help cover Investment Bankers’ operating expenses;
or (4) that the proceeds of the 1994 debentures would not be held in government
securities.  Several former sales
representatives at the company testified that they believed the debentures were
a safe investment and that they had sold the debentures to friends or family
members who were looking for a safe investment. 

            David Pilant,
an expert witness called by the State, analyzed the books of Investment Bankers
and testified that the proceeds of the 1994 debentures were used to meet the
company’s operating expenses, including the salaries of Burrell and Richard,
their expenses, and interest on the 1992 debentures.  Pilant also
testified that the company used the proceeds from the sales of the 1994
debentures to fund Burrell and Richard’s 401(k) plans, their withholding taxes,
lease payments on their cars, maintenance of property holdings, a yacht, and
country-club dues.  

            By indictment, Burrell and Richard
were charged with the felony offense of securities fraud under article
581-29(C) of the Texas Revised Civil Statutes. 
See Tex. Rev. Civ. Stat. Ann. art.
581-29(C) (Vernon Supp.
2002).  The cases against Burrell and
Richard were tried together to a single jury. 
In accordance with the indictments against them and in addition to other
instructions and definitions, the trial court gave the following charge to the
jury as to each appellant:

Now therefore, if you find from the evidence beyond a reasonable doubt
that heretofore on or about various dates between February 15, 1994 and July
25, 1994, in Harris County, Texas, the defendant [Burrell or Richard]
Murchison, acting alone or with [the other defendant] as a party to the
offense, as that term is hereinbefore defined, did then and there unlawfully,
or intentionally, pursuant to one scheme and continuing course of conduct,
directly or indirectly, offer for sale, and/or sell securities, namely, a
subordinated debenture issued by the Murchison Group, Inc., to [sixteen named
complainants], who are hereafter referred to as the complainants, and did
obtain money in an aggregate amount of one hundred thousand dollars or more
from the sale of said securities to the above complainants, and the defendant
did then and there directly or indirectly engage in fraud by intentionally
failing to disclose to the complainants the following material fact or facts
which was/were known to the defendant and the defendant intentionally failed to
disclose said fact or facts to the complainants for the purpose of inducing the
complainants to purchase the said securities;

(1) That Hurst-Murchison Corporation, an affiliated entity of Murchison
Group, Inc., and its predecessor in interest, had previously sold approximately
$450,000.00 of similar subordinated debentures in 1992, and the defendant had
directly and/or indirectly represented to the 1992 debenture purchasers that
the 1992 debentures were collateralized or secured by United States Treasury
Notes, when in fact only approximately $300,000.00 in Treasury Notes were
purchased or acquired to collateralize or secure the investments of the 1992
debenture purchasers, and said Treasury Notes were sold in approximately July
of 1993, and that the revenues from the sale of 1992 subordinated debentures,
and from the subsequent sale in approximately July of 1993 of the approximate
$300,000.00 in United States Treasury Notes were placed in the general
operating business bank account of Murchison Investment Bankers, Inc., also
known as Murchison Investment Bankers, Ltd., and expended for the general
operating expenses of the affiliated companies, Murchison Group, Inc., and the
Murchison Investment Bankers, Inc., and/or for the personal use of Burrell
Murchison, Chairman/Chief Executive Officer of the Hurst-Muchison
Corporation and/or Murchison Group, Inc., and Richard Murchison, President of
the Hurst-Murchsion Corporation and/or The Murchison
Group, Inc., or

(2) That Murchison Investment Bankers, Inc., an affiliated company of
The Murchison Group, Inc., an entity substantially responsible for producing
the revenue and income of Murchison Group, Inc., had sustained net operating
losses of approximately $77,000.00 in January of 1994; and/or approximately
$112,000.00 in February of 1994; and/or approximately $211,000.00 in March of
1994; and/or approximately $155,000 in April of 1994; and/or approximately
$75,000.00 in May of 1994; and/or approximately $25,000.00 in June of 1994;
and/or approximately $75,000.00 in July of 1994, or

(3) That Murchison Investment Bankers, Inc., sold substantially its
entire owned inventory of securities between approximately April 15, 1994 and
June 24, 1994, thereby reducing Murchison Investment Bankers, Inc.’s net
capitalization balances to limits less than permissible under the rules and
regulations of the National Association of Securities Dealers, or

(4) That the 1993 financial statements used by Murchison Investment
Bankers, Inc., to promote the sale of the Instant Securities were outdated and
showed the company to be in a positive, viable condition when in fact, the
company needed revenues generated from the sale of the Instant Debentures to
meet its ordinary operating expenses, or

(5) That revenues from the sale of the Instant Debentures Securities
[sic] were needed for operating expenses and costs of The Murchison Group,
Inc., and  its affiliated companies, and
to pay interest to purchasers of the 1992 aforementioned subordinated
debentures and for the personal use of the aforementioned Burrell Murchison and
Richard Murchison.

then you will find the defendant guilty as charged in the indictment.

The
jury found both appellants guilty.  The
trial court assessed punishment for each appellant at sixteen years’
confinement in the Institutional Division of the Texas Department of Criminal
Justice.  

                                           II.  Issues Presented on Appeal

In
this consolidated appeal, appellants assert the following issues:

!         Did the trial court abuse its discretion by excluding the
testimony of appellants’ expert, Dr. Kenneth Lehrer?  (first issue)

!         Did the trial court err when it denied appellants’ request
for a mistake-of-fact instruction in the jury charge?  (second issue)

!         Was there legally and factually sufficient evidence to
support the jury’s findings that appellants intended to defraud the
complainants?  (third, fourth, fifth, and
sixth issues)

!         Was there factually sufficient evidence to show that Richard
was liable under the law of parties? 
(seventh, eighth, and ninth issues)

!         Did the jury charge violate appellants’ constitutional right
to a unanimous jury verdict?  (tenth
issue)

!         Did the trial court become an advocate for the State during
trial by making numerous comments that conveyed its opinion of the
professionalism of appellants’ counsel and by ruling on several hearsay
objections without asking the State for a response?  (eleventh and twelfth issues)

 

                                               III.  Analysis and Discussion

Did the trial court abuse its
discretion by excluding Dr. Kenneth Lehrer’s testimony?

            In their first issue, appellants
assert the trial court abused its discretion when it excluded the testimony of
Dr. Kenneth Lehrer, appellants’ expert. 
We review the trial court’s exclusion of Dr. Lehrer’s testimony under
the abuse-of-discretion standard of review. 
See Weatherred
v. State, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); Penry v. State,
903 S.W.2d 715, 762 (Tex. Crim. App. 1995).  A trial court abuses its discretion when its
decision lies outside the zone of reasonable disagreement.  Montgomery v. State, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990).  In determining whether the trial court
abused its discretion, we consider whether the court acted without reference to
guiding rules and principles; that is, whether the court acted arbitrarily or
unreasonably.  Lyles v. State, 850 S.W.2d 497, 502 (Tex. Crim.
App. 1993).  

            In appellants’ offer of proof, Dr.
Lehrer testified: (1) the increase in interest rates that caused the drop in
value of the 1668S and 9424-H bonds was unforeseeable; (2) it was reasonable
for appellants to believe that they could pay back the complainants at the time
the 1994 debentures were sold; (3) the Murchison companies did not need to disclose
the existence of the repurchase agreements relating to the 1668S and 9424-H
bonds; and (4) “the Securities and Exchange Commission Act of  ’33 and ’34” requires buyers of debentures to
take certain due-diligence measures on their own.  The trial court sustained the State’s
objection that this testimony was not relevant and excluded this evidence.  

            On appeal, appellants argue the
trial court abused its discretion in excluding this evidence under Texas Rule
of Evidence 401.  See Tex. R. Evid. 401. 
Appellants assert this evidence was relevant to their alleged fraudulent
intent, which appellants claim was an alleged intent to sell the 1994
debentures knowing that the company did not have the ability to repay the
debentures.  To be relevant, evidence
must be both material and probative.  Miller v. State, 36 S.W.3d 503, 507 (Tex. Crim. App. 2001). 
Evidence is material if it is addressed to the proof of any fact of
consequence to the determination of the action. 
Tex. R. Evid.
401; Miller, 36 S.W.3d at 507.  If the proponent establishes that the
proffered evidence is material, Rule 401 also requires that the proponent
establish the evidence is probative — that it tends to make the existence of a
material fact more or less probable than it would be without the evidence.  Tex.
R. Evid. 401; Miller, 36 S.W.3d at 507.

            Appellants argue that Dr. Lehrer’s
testimony was relevant to the issue of whether appellants intended that the
company pay its obligations under the 1994 debentures and whether appellants
knew that the company was unable to repay these obligations.  This argument fails because this case does
not involve these issues.  As stated
above, appellants were charged with intentional failure to disclose to the
complainants one or more of the five material facts listed above (“Material
Facts”).  Appellants were not charged
with either: (1) intending not to repay the 1994 debentures; or (2) knowing the
company could not repay the 1994 debentures. 
The culpable mental state applies to the criminal act or acts with which
the defendant is charged.  Cook v. State, 824 S.W.2d 634, 637–38
(Tex. App.—Dallas 1991, pet. ref’d) (holding that
culpable mental state under  Tex. Rev. Civ. Stat.
Ann. art. 581-29(C) relates to conduct that allegedly violates this
statute and not to damages to complainants that may be caused by this
conduct).  Dr. Lehrer’s testimony
regarding the foreseeability of the decrease in the
bonds’ value and his testimony relating to the company’s ability to pay the
debenture holders is not material to the charges that appellants intentionally
failed to disclose to the complainants one or more of the Material Facts.  Because this testimony is not addressed to
the proof of any fact of consequence to the determination of this action, the
trial court did not abuse its discretion in determining this testimony was not
relevant.  See Tex. R. Evid. 401; Miller,
36 S.W.3d at 507.

            In their brief, appellants also make
statements in passing that Dr. Lehrer’s testimony was relevant for the
following reasons: (1) it showed the company did not need to list as a
liability the repurchase agreements relating to the 1668S and 9424-H bonds;[1] (2)
to counter Donald Katz’s testimony as to the value of the bonds; (3) to clarify
Burrell’s affidavit, which explained why the company wanted to sell the 1668S
and 9424-H bonds and the purposes of those sales; (4) to explain why Burrell
told Dale Hearn that “he didn’t think that — they didn’t know it was wrong;”
(5) to explain Richard’s statement that “this was a gray area;” and (6) to explain
to the jury the responsibility of each complainant to act as a “reasonable
investor.”  Appellants cite no authority
in support of these conclusory statements.  Texas Rule of Appellate Procedure 38.1(h)
provides that the “brief must contain a clear and concise argument for the
contentions made, with appropriate citations to authorities and to the record.”
 Tex. R. App. P. 38.1(h).  Conclusory
arguments which cite no authority present nothing for our review.  See
Vuong v. State, 830 S.W.2d 929, 940 (Tex. Crim. App. 1992); King
v. State, 17 S.W.3d 7, 23 (Tex. App.—Houston [14th
Dist.] 2000, pet. ref’d).  Therefore, appellants have waived error as to
these items.  See Salazar v. State, 38 S.W.3d 141, 147 (Tex. Crim. App. 2001); King,
17 S.W.3d at 23.  

            Even if appellants had not waived
error, we still would hold that the trial court did not abuse its discretion by
excluding Dr. Lehrer’s testimony on the ground it was not relevant. Regarding
the repurchase agreements, Dr. Lehrer testified in the offer of proof that the
Murchison companies did not have to disclose these agreements.  However, appellants were not charged with
failure to disclose the repurchase agreements. 
Nothing in Dr. Lehrer’s testimony counters Donald Katz’s testimony as to
the value of the bonds in 1994, so the evidence was not probative on this
point.  See Miller, 36 S.W.3d at
507.  The trial court admitted Burrell’s
affidavit into evidence, and in any event, it would not be an abuse of
discretion to find that explanations why appellants wanted to sell the bonds
and why they thought the sales of the bonds were beneficial to their customers
were not relevant to the charges that appellants failed to disclose the
Material Facts.  Except for the argument
regarding the intent to repay the complainants, which we already have rejected,
Dr. Lehrer’s testimony does not explain either: (1) Burrell’s alleged statement
that “he didn’t think that — they didn’t know it was wrong” to guarantee the
buyers of the bonds against any loss; or (2) Richard’s statement that “this was
a gray area.” 

            Finally, Dr. Lehrer’s discussion of
each complainant’s responsibility to act as a “reasonable investor” under
federal securities law is not relevant to a criminal prosecution under a Texas
statute that does not require proof of reliance, reasonable or otherwise.  See Tex. Rev. Civ. Stat.
Ann. art. 581-29(C);  Birchfield v. State,
401 S.W.2d 825, 828 (Tex. Crim. App. 1966) (holding
that Tex. Rev. Civ.
Stat. Ann. art. 581-29(C) does not require proof of reliance by the investor
on defendant’s fraud).  Therefore, even
if appellants had not waived their complaints as to these items, there would be
no abuse of discretion as a result of the trial court’s exclusion of Dr.
Lehrer’s testimony.  See Miller,
36 S.W.3d at 507.  Accordingly, we
overrule appellants’ first issue.

Did the trial court err when it denied appellants’ request for a
mistake-of-fact instruction in the jury charge?

 

            In their second issue, appellants
assert the trial court erred in refusing them a jury instruction on mistake of
fact based on the following evidence: (1) Burrell’s affidavit; (2)  Donald Katz’s testimony that he gave Burrell
and Richard profit-and-loss statements on a monthly basis;[2] (3) James
Arnold’s testimony that Richard stated that the repurchase agreements with the
buyers of the bonds was “not really a black and white area, it’s really a gray
type of area;” (4) Burrell’s alleged statement that “he didn’t think that —
they didn’t know it was wrong” to guarantee the buyers of the bonds against any
loss; and (5) testimony that the Murchison companies originally acquired the
1668S and 9424-H bonds through a mistake by a sales representative.  

            Under the defense of mistake of
fact, “[i]t is a defense to prosecution that the
actor through mistake formed a reasonable belief about a matter of fact if his
mistaken belief negated the kind of culpability required for commission of the
offense.”  See Tex. Pen. Code Ann. §
8.02(a).  An accused has the right to an
instruction on any defensive issue raised by the evidence, whether that
evidence is weak or strong, unimpeached or
contradicted, and regardless of what the trial court may or may not think about
the credibility of the evidence.  Granger v. State, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999). 
This rule is designed to ensure that the jury, not the judge, will
decide the relative credibility of the evidence.  Id.  Therefore, the issue before this court is
whether the evidence cited by appellants, if believed, raised a mistake-of-fact
defense by negating appellants’ intentional failure to disclose the Material
Facts.  See Tex. Pen. Code Ann. § 8.02(a); Granger, 3 S.W.3d at 38.  If the evidence viewed in a light favorable
to appellants does not establish a mistake-of-fact defense, the trial court did
not err in refusing an instruction.  See Granger, 3 S.W.3d at 38. 

            First, in order to raise an issue of
mistake of fact, the evidence, viewed in a light favorable to appellants, must
have raised an issue as to the existence of a mistaken belief by appellants
that negates the culpable mental state as to all five of the Material
Facts.  See Gant v. State, 814 S.W.2d 444, 452–53 (Tex. App.—Austin 1991,
no pet.) (holding trial court did not err in refusing mistake-of-fact
instruction in case under Tex. Rev. Civ. Stat. Ann. art. 581-29(C), where mistaken
belief was not raised as to each of the material facts that defendants
allegedly failed to disclose).  The
evidence cited by appellants fails to raise an issue regarding an alleged mistaken
belief by appellants that negates the culpable mental state as to all five of
the Material Facts.  Therefore, the trial
court did not err in refusing appellants’ mistake-of-fact instruction.  See
Gant, 814 S.W.2d at 452–53; see also
Gerber v. State, 845 S.W.2d 460, 466–67 (Tex. App.—Houston [1st Dist.]
1993, pet. ref’d) (holding that failure to charge on
mistake of fact as to manslaughter was harmless error where there was a
mistake-of-fact instruction as to murder, jury convicted defendant of murder,
and evidence supported murder conviction).

            Furthermore, viewed in a light
favorable to appellants, none of the evidence cited by appellants raises an
issue regarding an alleged mistaken belief by appellants that negates the
culpable mental state as to any of the Material Facts.  Burrell’s affidavit explains why appellants
wanted to sell the bonds and why they thought the sales of the bonds were
beneficial to their customers.  This does
not raise an issue regarding a mistaken belief that would negate intent as to
appellants’ failure to disclose.  

            Appellants also cite certain
testimony of Donald Katz.  They claim
that Katz testified he gave Burrell and Richard profit-and-loss statements on a
monthly basis indicating the company was in net-capital compliance.  However, the testimony cited by appellants
says nothing about net-capital compliance; rather, Katz only says that he gave
Burrell and Richard profit-and-loss statements on a monthly basis.  Some of these statements appear to have been
admitted as State’s Exhibits 5-A through 5-F. 
Appellants do not discuss these exhibits or explain how they might show
that the company was in net-capital compliance. 
On their face, these documents do not appear to address net-capital
compliance.  We have found no testimony
from Katz that he gave appellants documents indicating the company was in
net-capital compliance.  Therefore, this
testimony raises no issue as to mistake of fact.

            Likewise, viewed in a light
favorable to appellants, none of the following raises an issue regarding a
mistaken belief that would negate intent as to appellants’ failure to disclose
the Material Facts: (1) Richard’s alleged statement that the repurchase
agreements with the buyers of the bonds was “a gray type of area;” (2)
Burrell’s alleged statement that “they didn’t know it was wrong” to guarantee
the buyers of the bonds against any loss; and (3) the testimony as to how the
Murchison companies originally acquired the 1668S and 9424-H bonds.  Accordingly, we overrule appellants’ second
issue.

Was there
legally and factually sufficient evidence to support the jury’s findings that
appellants intentionally failed to disclose one or more of the Material Facts?

 

            In
their third, fourth, fifth, and sixth issues, appellants assert that there was
legally insufficient evidence or, in the alternative, factually insufficient
evidence to support the jury’s findings of appellants’ intentional failure to
disclose one or more of the Material Facts. 
In evaluating a legal-sufficiency challenge, we view the evidence in the
light most favorable to the verdict.  Wesbrook v. State, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). 
The issue on appeal is not whether we, as a court, believe the State’s
evidence or believe that appellants’ evidence outweighs the State’s evidence.  Wicker v. State, 667 S.W.2d 137, 143 (Tex.
Crim. App. 1984). 
The verdict may not be overturned unless it is irrational or unsupported
by proof beyond a reasonable doubt. Matson
v. State, 819 S.W.2d 839, 846 (Tex. Crim. App.
1991).  The jury, as the trier of fact, “is the sole judge of the credibility of
witnesses and of the strength of the evidence.”  Fuentes v. State, 991 S.W.2d
267, 271 (Tex. Crim. App. 1999).  The jury may choose to believe or disbelieve
any portion of the witnesses’ testimony.  Sharp v. State, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). 
When faced with conflicting evidence, we presume the trier
of fact resolved conflicts in favor of the prevailing party.  Turro v. State, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993). 
Therefore, if any rational trier of fact could
have found the essential elements of the crime beyond a reasonable doubt, we
must affirm.  McDuff v. State,
939 S.W.2d 607, 614 (Tex. Crim. App. 1997).

            In contrast, when evaluating a
challenge to the factual sufficiency of the evidence, we view all the evidence
without the prism of “in the light most favorable to the prosecution” and set
aside the verdict only if it is “so contrary to the overwhelming weight of the
evidence to be clearly wrong and unjust.”  Johnson v. State, 23 S.W.3d 1, 6–7 (Tex. Crim. App. 2000). This concept embraces both “formulations
utilized in civil jurisprudence, i.e., that evidence can be factually
insufficient if (1) it is so weak as to be clearly wrong and manifestly unjust
or (2) the adverse finding is against the great weight and preponderance of the
available evidence.”  Id. at
11.  Under this second formulation, the
court essentially compares the evidence which tends to prove the existence of a
fact with the evidence that tends to disprove that fact.  Jones
v. State, 944 S.W.2d 642, 647 (Tex. Crim. App.
1996).  In conducting the
factual-sufficiency review, we must employ appropriate deference so that we do
not substitute our judgment for that of the fact finder.  Id. at
648.  Our evaluation should not intrude
upon the fact finder’s role as the sole judge of the weight and credibility
given to any witness’s testimony.  Cain v. State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). 

            Although appellants assign error as
to the legal and factual sufficiency of the evidence supporting the findings
that they intended to defraud the purchasers of the 1994 debentures,
appellants’ argument, record citations, and authorities do not address their
intent to defraud.  Therefore, appellants
have waived error as to the sufficiency of the evidence to support the jury’s
findings as to intent to defraud.  See Tex.
R. App. P. 38.1(h); Vuong, 830 S.W.2d at 940; King, 17 S.W.3d at 23.  

            Even if appellants had not waived
error, we still would conclude that there was legally and factually sufficient
evidence to support the jury’s findings that appellants intentionally failed to
disclose to the complainants one or more of the Material Facts for the purpose
of inducing the complainants to purchase the 1994 debentures.  The fact finder determines intent from all the
facts and infers intent from the conduct and circumstances surrounding those
facts.  See Williams v. State, 688 S.W.2d 486, 488 (Tex. Crim. App. 1985); Fisher
v. State, 803 S.W.2d 828, 831 (Tex. App.—Dallas 1991, pet. ref’d).  The record
contains  ample evidence to support the
jury’s findings that the failure to disclose one or more of the Material Facts
was intentional, including the following: 

!         misrepresentations to purchasers of the 1992 debentures
regarding the security of their investment; 

!         appellants’ knowledge of the deteriorating financial
condition of the Murchison companies; 

!         actions by appellants to take two large bonds that had
dropped in value “off the books” through sales that were subject to repurchase
agreements and that actually increased the company’s liabilities; 

!         steps by Burrell to conceal the existence of the repurchase
agreement as to the 9424-H bond by taking a letter confirming this agreement
away from James Arnold and by refusing requests to confirm this agreement in
writing; 

!         misstatements about the security of the 1994 debentures; 

!         statements by Burrell that “everything was going great” and
that the proceeds of the 1994 debentures would be used to buy securities; and 

!         appellants’ refusal to supply purchasers of the 1994
debentures with more current financial information, even though appellants had
seen more recent monthly reports showing a deteriorating financial situation. 

 

Thus,
notwithstanding appellants’ waiver of their legal and factual sufficiency
issues, the record contains legally and factually sufficient evidence to
support the jury’s findings of appellants’ intentional failure to
disclose.  See Bridwell v. State, 804 S.W.2d 900,
903–04 (Tex. Crim. App. 1991) (holding that evidence
was sufficient to support conviction under Tex.
Rev. Civ. Stat. Ann. art. 581-29(C) for
intentional failure to disclose material facts); Gant, 814 S.W.2d at 447–50 (holding evidence sufficient to support
securities-fraud conviction).  

            Under these issues, appellants make
various arguments that go beyond the sufficiency of the evidence to support the
findings of intentional failure to disclose. 
In the interest of justice, we examine these assertions to see if they
challenge the sufficiency of the evidence in other respects.  Regarding the first Material Fact, appellants
assert there was no evidence that the proceeds from the sales of the 1992
debentures were used for anything other than the expansion of the company, that
interest on these debentures was paid until 1994, and that the statute of
limitations bars any allegation of fraud as to the sale of these
debentures.  These assertions are not
relevant to the sufficiency of the evidence supporting intentional failure to
disclose as to the first Material Fact. 
Further, the indictments in this case do not charge appellants with
fraud in the sale of the 1992 debentures.

            As to the second Material Fact,
appellants assert the evidence did not show that they knew of operating losses
sustained by the company from January through July of 1994, because the company
still had positive retained earnings, even in the face of losses in the first
half of 1994.  Appellants assert the
problem arose when James Arnold did not fill out the proper form to document the
repurchase agreement on one of the bonds he sold.  These arguments have no merit.  Positive retained earnings do not change the
fact that the company was experiencing operating losses.  There is sufficient evidence in the record —
for example, the testimony of Donald Katz — that appellants were aware of the
operating losses in 1994.       As to the third Material Fact, appellants
assert there was no evidence that purchasers of the 1994 debentures relied on
the fact that the company held an inventory of securities and that there was
evidence that the principal source of income for Investment Bankers during 1994
was the sale of collateralized mortgages. 
These assertions are not relevant to the third Material Fact.  Reliance by the purchasers of the 1994
debentures is not an element of this offense. 
See Tex. Rev. Civ. Stat. Ann. art.
581-29(C); Birchfield,
401 S.W.2d at 828 (holding that Tex.
Rev. Civ. Stat. Ann. art. 581-29(C) does not
require proof of reliance by the investor on defendant’s fraud).

            As to the fourth Material Fact,
appellants assert there was no evidence the company used out-of-date financial
statements to influence the purchasers of the 1994 debentures.  There was evidence that the 1993 financial
statements were part of the company’s brochure used to promote the sale of the
1994 debentures.  There was sufficient
evidence the Murchisons failed to disclose to the
complainants (1) the deterioration in the financial condition of the company in
the first quarter of 1994; (2) the outdated nature of the 1993 financial
statements in light of the company’s true financial condition at the time it
sold the debentures; and (3) that the company needed the proceeds from the
debentures to meet ordinary operating expenses. 
The evidence was sufficient to show the failure to disclose this
information to the complainants was material. 
Consequently, appellants’ arguments fail.  

            As to the fifth Material Fact,
appellants assert there was no evidence that the company was restricted from
using the proceeds of the debenture sales to pay the holders of the 1992
debentures.  Any lack of restrictions on
the use of the proceeds is not relevant to the sufficiency of the evidence
showing that appellants intentionally failed to disclose that the revenues from
the sales of the 1994 debentures were needed for the purposes stated in the
fifth Material Fact.  Appellants also
assert that there was no evidence any of these proceeds were used for
appellants’ personal expenses.  However,
David Pilant testified that some of the proceeds from
the sales of the 1994 debentures were used to cover appellants’ personal
expenses. 

            Under the fifth and sixth issues,
appellants quote a statutory definition of deception, but they never explain
how this definition relates to the sufficiency of the evidence in a
securities-fraud case.  Appellants also
assert that they never represented to the complainants that Treasuries would be
used as collateral or security for the 1994 debentures.  This assertion overlooks testimony that
Burrell told salesman Ed Hiers the proceeds would be
placed in Treasuries held as collateral. 
Moreover, the record contains testimony that Burrell told a purchaser of
a 1994 debenture that it would be backed up by Treasuries.  

            Having found appellants’ various
arguments lack merit, we overrule appellants’ third, fourth, fifth, and sixth
issues.

Was there factually sufficient
evidence to show that Richard was liable under the law of parties?

            In their seventh, eighth, and ninth
issues, appellants assert the evidence was factually insufficient to show the
following: (1) Richard had knowledge of the day-to-day management decisions of
Murchison Group and Investment Bankers; (2) Richard was acting as a party to
the offense; and (3) Richard was criminally responsible for an offense
committed by the conduct of another. 

            Richard is criminally responsible as
a party to an offense either by his own conduct or by the conduct of another
for which he is criminally responsible, or by both.  See Tex. Pen. Code Ann. § 7.01(a).  Richard is criminally responsible for an
offense committed by Burrell if Richard, acting with intent to promote or
assist the commission of the offense, solicited, encouraged, directed, aided,
or attempted to aid Burrell to commit the offense.  See id. § 7.02(a)(2).  

            In order to establish liability as a
party, the State must show that, at the time of the commission of the offense,
the parties were acting together, each contributing in some way to the
execution of their common purpose.  See Ex parte Welborn, 785 S.W.2d 391, 394 (Tex. Crim.
App. 1990).  An agreement of the parties
to act together in a common design can seldom be proved by direct evidence, and
the fact finder may rely on the action of the parties, showing by either direct
or circumstantial evidence an understanding and common design to commit the
offense.  See id.  The court may
examine events occurring before, during, and after the commission of the
offense.  See id.  

            In support of their arguments,
appellants cite their affidavits that were admitted in evidence.  In his affidavit, Burrell states he was left
in charge of the day-to-day operations due to Richard’s illness.  According to Burrell’s affidavit, Richard and
Burrell did not discuss the repurchase agreements regarding the 1668S and
9424-H bonds because of Richard’s illness. 
In his affidavit, Richard recounts the ailments he and his wife
experienced during the relevant time period. 
According to Richard, his wife had chronic fatigue syndrome, and he was
taking medication for severe anxiety.  As
a result of these conditions, Richard claims he turned over his management
responsibilities to Burrell.  Appellants
also cite testimony that Richard denied the existence of the repurchase
agreements regarding the 1668S and 9424-H bonds.

            After applying the appropriate
standard of review, we conclude the evidence was factually sufficient to show
Richard was liable under the law of parties. 
There was evidence of the following: (1) Burrell and Richard both
attended and participated in the initial meeting spelling out the purpose and
details of the sales of the 1994 debentures; (2)  Burrell and Richard presented the sales
representatives with a booklet, including the 1993 financial statement, to be
used to promote the 1994 debentures; (3) Richard participated in discussions
regarding the 1994 debentures with at least one purchaser; (4) when James
Arnold, on behalf of purchasers of the 9424-H bond, asked Richard and Burrell
for written confirmation of the repurchase agreement, they did not provide it
and, instead, Richard told Arnold to tell the customers, “to sit tight and
don’t be nervous, just to hang in there;” and (5) when Dale Hearn, accompanied
by James Arnold, approached Richard and expressed concerns over the propriety
of the sales of the 1668S and 9424-H bonds, Richard responded that “he understood
why [he] was concerned, but this was a gray area.”  

            The evidence in the record shows
Richard had been a part of the companies since their creation and that he
participated in the sales of the 1992 debentures and in the meeting in which
the 1994 debentures were presented to the sales representatives.  During and after the sales of the 1994
debentures, Richard participated in efforts to ensure that the company’s sales
representatives and customers remained confident.  Richard participated in the company’s refusal
to confirm one of the repurchase agreements in writing.  Richard’s response to Dale Hearn indicates
that Richard was aware of and had considered the terms of the sales of the
1668S and 9424-H bonds.  Regardless of
Richard’s knowledge of the day-to-day operations, the evidence was factually
sufficient to show that Richard, acting with intent to promote or assist the
commission of the offense, solicited, encouraged, directed, aided, or attempted
to aid Burrell to commit the offense.  See Jarnigan v. State,
57 S.W.3d 76, 88–89 (Tex. App.—Houston [14th
Dist.] 2001, pet. ref’d) (finding factually
sufficient evidence to support conviction based on the law of parties).  Accordingly, we overrule appellants’ seventh,
eighth, and ninth issues.  

Did the jury charge violate appellants’ constitutional right to a
unanimous verdict?

 

            In their tenth issue, appellants
assert the trial court erred in refusing appellants’ requested jury instruction
that, to convict, all jurors must unanimously agree that appellants intentionally
failed to disclose at least one of the five Material Facts listed in the jury
charge.[3]  Appellants assert the jury charge violated
their right under the Texas Constitution to have the jury return a unanimous
verdict of guilt.  See Tex. Const. art.
V, § 13; Molandes v. State, 571 S.W.2d 3, 4 (Tex. Crim. App. 1978) (stating that defendants in felony
criminal cases have right to a unanimous verdict of guilt under Tex. Const. art. V, § 13).  Under the applicable statutes, all of the
criminal conduct with which appellants were charged constitutes a single
offense.  Because it is proper to charge
the jury in the disjunctive as to multiple manner and means for the commission
of a single offense, we conclude the jury charge in this case did not violate appellants’
right to a unanimous verdict under the Texas Constitution.  See
Francis v. State, 36 S.W.3d 121, 122–24 (Tex. Crim. App. 2000); Kitchens
v. State, 823 S.W.2d 256, 258 (Tex. Crim. App.
1991).

            Alternate manner and means of
committing a single offense may be charged in the same indictment. 
Kitchens, 823 S.W.2d at 258. 
Even if the indictment alleges different means of committing the offense
in the conjunctive, it is still proper to charge the jury on those alternatives
in the disjunctive.  See Kitchens, 823 S.W.2d at 258; Gant, 814 S.W.2d at 454 (holding trial court did not err in
charging jury in disjunctive on different means of committing securities
fraud).  Where alternative theories of
committing the same offense are submitted to the jury disjunctively, it is
proper for the jury to return a general verdict if the evidence is sufficient
to support a finding under any of the theories submitted.  See
Kitchens, 823 S.W.2d at 258.  There
is no requirement that the jury designate which of the alternative means of
committing the offense they found to have been proven.  See id.

            Appellants rely on Francis v. State to support their
argument that allowing conviction without consensus as to any of the Material
Facts violated their rights under the Texas Constitution.  See
Francis, 36 S.W.3d at 122–25.  In Francis, the Court of Criminal Appeals
reversed the defendant’s conviction on a single charge of indecency with a
child because the jury charge impermissibly allowed a non-unanimous
verdict.  See id. at 122–25.  The Court
of Criminal Appeals stated that submitting alternate theories of committing a
single offense in the jury charge does not violate a defendant’s right to a
unanimous jury verdict.  See Francis, 36 S.W.3d at 123–24; see also Kitchens, 823 S.W.2d at
257–58.  On the other hand, the Francis court held that submitting more
than one offense to the jury in the disjunctive violated the defendant’s right
to a unanimous jury verdict.  See Francis, 36 S.W.3d at 124–25.  Therefore, this court must determine whether
the charge in this case submitted more than one offense, so as to violate
appellants’ right to a unanimous jury verdict. 


            The Texas Securities Act states that
“[w]hen amounts are obtained in violation of this Act under one scheme or
continuing course of conduct, whether from the same or several sources, the
conduct may be considered as one offense and the amounts aggregated in
determining the grade of the offense.”  See Tex.
Rev. Civ. Stat. Ann. art. 581-29-2 (Vernon Supp.
2002).  The indictment alleged, and the
jury found, that appellants obtained money in violation of article 581-29 under
one scheme or continuing course of conduct. 
See id.  Under the plain meaning of this statute and
under the indictments, each appellant was 
properly charged and tried for only one offense — intentionally failing
to disclose to the complainants a material fact or facts in violation of
article 581-29(C) under one scheme or continuing course of conduct.  See
Tex. Rev. Civ.
Stat. Ann. arts. 581-29, 581-29-2. 
The jury unanimously found that appellants intentionally, under one
scheme and continuing course of conduct, directly or indirectly, sold the 1994
subordinated debentures to the complainants. 
The jury also unanimously found that appellants directly or indirectly
engaged in fraud relating to these sales by intentionally failing to disclose
to the complainants one or more of the Material Facts for the purpose of
inducing the complainants to buy the debentures.  Therefore, the five Material Facts listed in
the court’s charge were alternative manner and means of committing the same
offense relating to the sale of the 1994 debentures, and the jury charge did
not violate appellants’ right to a unanimous jury verdict.  See
Francis, 36 S.W.3d at 123–24; Kitchens,
823 S.W.2d at 257–58. 

            The holding in Francis does not govern this case. 
In Francis, though the two
incidents of indecency with a child were charged together in a single
indictment, these incidents were two separate offenses.  See
Francis, 36 S.W.3d at 123–25.  In
this case, however, each indictment charged only one offense.  See Tex. Rev. Civ. Stat.
Ann. arts. 581-29, 581-29-2.  The Francis case confirms prior cases
holding that it is proper to charge the jury with alternative manner and means
of committing a single offense.  See Francis, 36 S.W.3d at 123–25.

            Although not exactly on point, the Gant case supports our ruling on
appellants’ tenth issue.  In Gant, the defendant was charged with
securities fraud under article 581-29(C) as to four different investors.  See
Tex. Rev. Civ.
Stat. Ann. art. 581-29(C); Gant,
814 S.W.2d at 447 & n.3.  The opinion
in Gant indicates that each
indictment alleged the same fraudulent conduct by the defendant and that this
conduct included two misrepresentations and the intentional failure to disclose
two different facts.  See Gant,
814 S.W.2d at 447–48, 452–53 & n.3. 
In Gant, the court rejected
the appellant’s assertion that the trial court erred in charging the jury in
the disjunctive as to this alleged fraudulent conduct when the indictments
alleged this conduct in the conjunctive. 
See id. at 453.  The Gant case does not discuss this issue in
detail, and there is no indication that Gant
involved a challenge based on the right to a unanimous jury verdict.  See
id. 
Nonetheless, Gant does
indicate that it is proper to charge the 
jury in the disjunctive as to alternative theories of fraud in a
securities-fraud case under article 581-29(C). 
See id.

            There is further support for our
disposition of the tenth issue in the Texas Court of Criminal Appeals cases
applying the aggregate-theft provision of the Texas Penal Code, which contains
language substantially similar to article 581-29-2.  See Tex. Pen. Code Ann. § 31.09; Tex. Rev. Civ. Stat.
Ann. art. 581-29-2; Dickens v.
State, 981 S.W.2d 186, 188 (Tex. Crim. App.
1998); Lehman v. State, 792 S.W.2d
82, 84–86 (Tex. Crim. App. 1990); Graves v. State, 795 S.W.2d 185, 187 (Tex. Crim.
App. 1990).  The Dickens court held that the unambiguous language of the
aggregate-theft statute provides for the aggregation of multiple thefts into a
single offense, that aggregate theft is one offense, and that each subsidiary
theft is a component of the single offense of aggregate theft.  See
Dickens, 981 S.W.2d at 188.  The Graves court held that the
aggregate-theft statute constitutes one offense consisting of two or more
incidents of theft.  See Graves, 795
S.W.2d at 187.  The Graves court also held that this
statute creates a separate offense and defines conduct for purposes of
jurisdiction, punishment, and statute of limitations.  See id.

            The Lehman court approved a jury charge in an aggregate-theft case that
allowed the jury to convict if it found that the defendant committed one or
more of the six alleged thefts under one scheme and continuing course of
conduct, as long as the total value of money obtained, if any, was more than
$750 and less than $20,000.  See Lehman, 792 S.W.2d at 83–87.  The Lehman
court stated that the six alleged thefts were alternative “manner and means”
that were properly pleaded in the conjunctive in the indictment and charged in
the disjunctive to the jury.  See id. 
If the jury need not unanimously agree as to which of these six thefts
were committed by an aggregate-theft defendant, then there is no reason why the
jury should be required to unanimously agree as to which of the Material Facts
the appellants intentionally failed to disclose.  See id.  

            Appellants also rely on two cases
from the United States Court of Appeals for the Fifth Circuit.  See United States v. Holley, 942 F.2d 916 (5th Cir. 1991); United States v. Gipson, 553 F.2d 453 (5th Cir.
1977).  These cases involve the Federal
Constitution, rather than the Texas Constitution, and are not binding on this
court. 
See Hulit v. State, 982 S.W.2d 431, 436–37
(Tex. Crim. App. 1998); Vaughn v. State, 931 S.W.2d 564, 568 & n.5 (Tex. Crim. App. 1996). 
The Holley case does not help
appellants because, in that case, the trial court charged the jury in the
disjunctive as to two separate offenses, which distinguishes Holley from the case at hand.  See
Holley, 942 F.2d at 925–29.  The Gipson case offers no support
either.  The Fifth Circuit has
distinguished Gipson, and a
four-justice plurality of the United States Supreme Court has rejected its
unanimity analysis.  See Schad v. Arizona, 501 U.S. 624,
633–39, 111 S. Ct. 2491, 2498–2501, 115 L. Ed. 2d 555 (1991) (plurality
opinion) (rejecting Gipson’s
unanimity analysis); United States v.
Bolts, 558 F.2d 316, 326 n.4 (5th Cir. 1977) (distinguishing Gipson as involving facts where trial
court expressly instructed the jury that a non-unanimous verdict was
permissible); see also State v. Jennings,
583 A.2d 915, 923–24 (Conn. 1990) (holding that Bolts limited Gipson to
cases in which the trial court expressly instructed the jury that a
non-unanimous verdict was permissible). 
We decline to adopt Gipson’s
analysis for the determination of appellants’ challenge under the Texas
Constitution.

            Because the alternative Material
Facts listed in the jury charge were alternative manner and means of committing
a single offense of securities fraud, the jury charge in this case did not
violate appellants’ right to a unanimous jury verdict under the Texas
Constitution.  See Tex. Const. art.
V, § 13; Tex. Rev. Civ.
Stat. Ann. arts. 581-29, 581-29-2;
Francis, 36 S.W.3d at 123–25; Kitchens,
823 S.W.2d at 258; Gant, 814 S.W.2d
at 454.  Therefore, we overrule
appellants’ tenth issue.

Did the trial court become an advocate for the State during trial by
allegedly making numerous comments that conveyed its opinion of the
professionalism of appellants’ counsel and by ruling on several hearsay
objections without asking the State for a response?

 

            In their eleventh and twelfth
issues, appellants assert the trial court erred by making numerous comments
that conveyed its opinion of the professionalism of appellants’ trial counsel
and by ruling on hearsay objections without asking the State for a
response.  We conclude that appellants
did not preserve error as to these issues. 
Moreover, we find these issues do not present fundamental error.

            The trial court suggested sua sponte that
it instruct the jury not to consider the trial court’s comments for any purpose
whatsoever.  Appellants agreed, and the
trial court gave the following instruction:

Yesterday afternoon I guess probably, you know, you don’t pay much
attention sometimes to what you say.  I
made a couple of comments that might have been offensive to one or both sides,
might have – hopefully wasn’t offensive to y’all, but if it was I apologize for
it.  Please know that I have no – a judge
has no business whatsoever, and nor do I have, feelings one way or the other in
a trial of a case, and if I ever make any comments inadvertently – of course,
y’all are not paying attention to it whatsoever because that’s not the judge’s
function.

 

Although
appellants point to a number of comments of the trial court that they claim
were erroneous, they cite only two objections. 
Appellants claim the following objections preserved error:

On behalf of the defendants we would like to interpose an objection,
and again with no disrespect for the Court but in discharging our obligations
to our client.

During the course of the proceedings the Court has asked questions sua sponte.  We should like to note our objection to the
procedure.  We believe that it
constitutes comments on the weight of the evidence.  We request that the jury be instructed again
that the Court has no opinion one way or the other and that any comments made
by the Court are not intended to reference any opinion by the Court, but we
believe that it compromises our position in the case, that it constitutes a
comment on the weight of the evidence.  

We should like for the record to reflect our objection and continuing
objection to the procedure.  We request
the jury instruction, and of course we move for a mistrial.  

. . .

Your Honor, again as a housekeeping matter, we request that the jury be
instructed when they return that during the course of this trial the Court has
made various comments or may have made certain comments.  We request that the jury be instructed that
those comments are not to be interpreted by the jury as having any effect on
the evidence if they are the sole judges of the facts in this case, and the
Court did not intend by participation in the matter to inject any opinion
regarding the evidence or in any way to influence the opinion of the jury, and
we ask that the jury be so instructed when they return.

 

            In its instruction to the jury, the
trial court did not specify or identify any particular comments from the
previous afternoon, nor did the court indicate that its instruction was to be
applied to any specific statements.  In
their two objections, appellants did not identify  which of the trial court’s comments were the
subject of their objections, nor did they object promptly after any comment of
the court.  They made one of these
objections at the beginning of a trial day in the morning, and the other
objection after a lunch recess before testimony started in the afternoon.  Generally, to preserve a complaint for
appellate review, a party must make a timely request, objection, or motion with
sufficient specificity to apprise the trial court of the complaint.  See
Tex. R. App. P. 33.1(a); Saldano v. State, 70 S.W.3d 873, 886–87 (Tex. Crim. App. 2002). 
Appellants’ two objections were neither timely nor specific.  See
Tex. R. App. P. 33.1(a); Saldano, 70
S.W.3d at 886–87.  

            Nonetheless, appellants assert the
trial court’s allegedly improper comments constitute fundamental error because
they violated their right to a fair trial by an impartial jury.  In these comments, appellants claim the trial
court: (1) responded to appellants’ hearsay objections by stating that the
testimony was not offered for the truth of the matter asserted and that the
objection was overruled; (2) stated, “Let’s move along;” (3) allowed the
State’s expert to testify but excluded most of the testimony of appellants’
expert, Dr. Lehrer; (4) lodged objections to the admissibility of Dr. Lehrer’s
testimony and excluded most of it without any objection from the State; (5)
expressed an opinion as to the credibility of the witnesses and the
professionalism of appellants’ trial counsel; (6) stated that the witness
already had answered the question asked; (7) instructed counsel not to argue
with the witness; and (8) told a witness to answer a question “if you
remember.”[4]  Even though appellants did not timely and
specifically object to these comments or otherwise preserve error in the trial
court, we may take notice of any fundamental errors affecting substantial
rights.  See Tex. R. Evid. 103(d); Jasper
v. State, 61 S.W.3d 413, 420 (Tex. Crim. App. 2001).

            It is proper for a trial court to
interject to correct a misstatement or misrepresentation of previously admitted
testimony, to clear up a point of confusion, or to expedite the trial.  See
Jasper, 61 S.W.3d at 420–22; Singleton
v. State, —S.W.3d—, 2002 WL 522278, at *6 (Tex. App.—Texarkana Apr. 9, 2002, no pet. h.).  Any comments relating to the exclusion of Dr.
Lehrer’s testimony took place outside the jury’s presence.  Contrary to appellants’ assertion, the State
did object to the admission of Dr. Lehrer’s testimony.  The trial court’s admission of the State’s
expert and exclusion of most of Dr. Lehrer’s testimony is not fundamental
error.  Appellants have not provided this
court with any record citations to support their assertion that the trial court
expressed an opinion as to the credibility of the witnesses or the
professionalism of appellants’ trial counsel. 
Further, a trial court’s irritation at the defense attorney does not
translate to an indication as to the court’s views about the defendant’s guilt
or innocence.  See Jasper, 61 S.W.3d at 420–22.  The trial court has broad discretion to
expedite and maintain control over the trial. 
See id.  None of the trial court’s comments rose to
such a level as to bear on the presumption of innocence or vitiate the
impartiality of the jury.  See Jasper, 61 S.W.3d at 420–22; Singleton, —S.W.3d at —, 2002 WL 522278,
at *6.  Because none of the trial court’s
comments was fundamental error, appellants’ failure to properly object in the
trial court waives error as to the eleventh and twelfth issues.  See
Jasper, 61 S.W.3d at 420–22; Nelson
v. State, 661 S.W.2d 122, 123–24 (Tex. Crim. App.
1983); Singleton, —S.W.3d at —, 2002
WL 522278, at *6; Lape v. State, 893 S.W.2d 949, 953 (Tex.
App.—Houston [14th Dist.] 1994, pet. ref’d).  

            Appellants also rely on Blue v. State, 41 S.W.3d 129 (Tex. Crim. App. 2000) (plurality op.).  Because there is no majority opinion in Blue, it is not binding precedent.  See
Pearson v. State, 994 S.W.2d 176, 177 n.3 (Tex. Crim.
App. 1999).  Even if it were, it would
not affect our analysis.   As Judge Keasler’s concurring opinion in Blue indicates, the trial court’s remarks in Blue reasonably could be interpreted as a predetermination of
Blue’s guilt, thus implicating the right to an impartial trial court.  See
Blue, 41 S.W.3d at 135–39 (Keasler, J.,
concurring).  The trial court’s comments
in this case are not of this nature. 
Therefore, Blue would not
apply to the facts of this case, even if it were binding precedent.  See
Jasper, 61 S.W.3d at 420–22; Blue, 41 S.W.3d at 129–135.  Accordingly, we overrule appellants’ eleventh
and twelfth issues.

                                                             IV.  Conclusion

            The trial court did not abuse its
discretion by sustaining the State’s objection that Dr. Lehrer’s testimony was
not relevant.  The trial court correctly
refused appellants’ mistake-of- fact instruction because, viewed in a light
favorable to appellants, the evidence did not raise an issue regarding an
alleged mistaken belief by appellants that negates the culpable mental state as
to appellants’ failure to disclose. 
Appellants’ arguments under their issues attacking the legal and factual
sufficiency of the evidence lack merit. 
Because the alternative Material Facts listed in the jury charge were
different manner and means of committing a single offense, the jury charge did
not violate appellants’ constitutional right to a unanimous verdict of
guilt.  Appellants did not specifically
and timely object to any of the trial court’s allegedly improper comments, and
because these comments are not fundamental error, appellants waived any error
as to these comments.  For these reasons,
we overrule all of appellants’ issues and affirm both of the trial court’s
judgments.

 

                                                                                    

                                                                        /s/        Kem Thompson
Frost

                                                                                    Justice

 

Judgment
rendered and Opinion filed July 25,
 2002.

Panel
consists of Justices Anderson, Hudson, and Frost.

Publish — Tex. R. App. P. 47.3(b).

 

 











            [1]  In the offer of proof, however, Dr. Lehrer
did not testify as to whether the Murchison companies needed to list the
repurchase agreements as liabilities; rather, he testified that the Murchison
companies did not need to disclose the existence of the repurchase agreements.





            [2]  Appellants also assert Katz testified that
these statements indicated the company was in net-capital compliance; however,
Katz did not so testify.





            [3]  The trial court gave separate jury charges
for Burrell and Richard.  These charges
were substantially similar.  Because
there was no material difference between these two charges for the issues
presented in this appeal, and for ease of reference, we refer throughout this
opinion to the “jury charge,” even though there were actually two jury charges
in the trial court.





            [4]  Several items listed in the appendix to
appellants’ brief as allegedly improper comments were made outside of the
presence of the jury.  These comments
could not have affected appellants’ right to an impartial jury trial.